No. 2--04--1169          Filed 3/2/07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04--CF--275 |
| | ) | |
| JAMES E. LEARN, | ) | Honorable |
| | ) | John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

Defendant, James E. Learn, was convicted after a bench trial of one count of aggravated criminal sexual abuse (720 ILCS 5/12--16(c)(1)(i) (West 2002)) and was sentenced to a term of probation and periodic imprisonment. Defendant's motion for a new trial and/or to reconsider the finding of guilt was denied, and this appeal followed. We reverse and remand for a new trial.

In February 2004, defendant was indicted on one count of aggravated criminal sexual abuse. The alleged victim in this case was defendant's four-year-old niece, K.O. The State moved to admit at trial K.O.'s out-of-court statements made to her father, C.O., and two police officers, pursuant to section 115--10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--10 (West 2000)). Defendant filed a motion to prevent the State from introducing any of these out-of-court statements at trial, arguing that section 115--10 of the Code was unconstitutional.

The trial court, Judge Christopher Starck presiding, held hearings to determine the admissibility of the statements made to C.O. and to Detective Ginger Stokes and Officer Ray Montemayor of the Highland Park police department. C.O. testified that, as he changed the diaper of his infant son, C.O., Jr., on December 26, 2003, K.O. touched C.O., Jr.'s penis. When C.O. told her not to do that again, K.O. said, " 'Why not? Jimmy does it.' " C.O. asked what she meant, and K.O. told him that "sometimes he [Jimmy] would touch her hand *** and put it on his parts, Jimmy's parts." K.O. used the word "cocita," meaning "little thing," when talking about Jimmy's private parts. When C.O. asked how Jimmy did that, K.O. told him:

> " '[O]ne time, he took my hand, and he has pants, with a hole in his pants. *** He takes my hand and he puts it inside the hole that he has in his pants by one of the legs.' She says, 'And my hand goes inside, and he makes me touch his part.' "

C.O. asked K.O. when it happened, but he testified that "she doesn't have the aspect of time, like what's a week, what's a day, a time limit." She told him that it happened " 'the other day,' " but he did not know what day she was talking about. K.O. told him of two occasions, but he could only clearly recount one occurrence. K.O. told him:

> " 'I was in the basement from [sic] the house. And he puts me on top of the bed. And we cover ourselves with a blanket or something. He touches my hand. And he puts it underneath his pants.' "

She then touched "his part," describing it as "something soft." According to C.O., she repeated that story "two, three, four times that night."

K.O., and the rest of the family, called defendant "Jimmy." When C.O. asked why she did not say anything before, she responded that she was scared. Defendant lived in the same house as

K.O.'s grandmother, who babysat K.O. almost every day while C.O. and his wife worked. Until December 26, 2003, K.O. never mentioned anything about defendant making her touch his private parts.

The trial court ruled:

"[S]hould the child testify, the time, content, and circumstances of this testimony is sufficient--would be sufficiently reliable to allow this testimony to go to the jury pursuant to Section 115--10, again, conditional upon the fact that the child does in fact testify in the case."

At a separate hearing, Detective Stokes testified that she interviewed K.O. at the police department on December 27, 2003. The interview was conducted in English, but Officer Montemayor was present in case a Spanish translator was needed. The interview was both videotaped and audiotaped. Stokes testified that she had been misinformed that K.O.'s grandfather, not her uncle, was the perpetrator. She asked K.O. if her grandfather had ever touched her inappropriately or if anybody had grabbed her hand and made her touch him in his private area, and K.O. said no. K.O. told Stokes that her cousin Kevin had shown her his "pee-pee"; when asked if anyone else had shown her his pee-pee, K.O. replied no, only Kevin. Stokes showed K.O. anatomical diagrams of both male and female forms and asked K.O. if she could identify different parts of the body. When Stokes drew a line to the penis, K.O. did not say anything.

Stokes and Montemayor interviewed K.O. again on December 30, 2003. K.O.'s mother was also present in the room, seated behind K.O. This interview was conducted in Spanish, with Montemayor translating, as K.O. told them she was more comfortable speaking Spanish. No recording, either video or audio, was made of this interview. According to Stokes, K.O. stated that,

"on several occasions[,] her Uncle Jimmy had taken her hand and placed it on his thingy." Once, Jimmy placed a blanket over her and placed her hand on his "thingy." K.O. related that Jimmy would wear long pants with a hole in front and that he would place her hand inside his pants. When Stokes asked how often this happened, K.O. said that "it was every time that she went over to her Uncle Jimmy's but not to baby-sit" and that it would happen "on his bed in the basement." Stokes also specifically testified that K.O. referred to Jimmy's penis as "thingy." Stokes again showed K.O. an anatomical diagram of a male and asked her to show where her hand had been placed and what it was called; K.O. pointed to the penis and said "that's the thingy." When asked why the first interview with K.O. had been videotaped, Stokes replied, "It was at the police department and our goal is not to have a five year old testify in a trial like this." The second interview was held at the Child Advocacy Center, which did not have video equipment.

Montemayor testified that he did not translate anything during the interview on December 26. He saw no indications that K.O. had any problem understanding or communicating in English. During the December 30 interview, he translated Stokes' English questions and K.O.'s Spanish responses. K.O. said that on one occasion, Jimmy grabbed her hand and made her touch his "thingy"; according to Montemayor, K.O. used the word "tosito," the Spanish word for "thingy." The trial court ruled:

> "[I]f the victim does testify the court believes that the time, content and
> circumstances of this testimony are sufficient, show sufficient areas of reliability and
> if she is subject to cross examination herself the court would allow the statements to
> go in ***."

Judge John Phillips then presided over the case. Before trial, the court held a hearing to determine K.O.'s competency as a witness. K.O.'s examination was conducted with the aid of an interpreter. K.O. was able to testify about her age, the names of her parents and brother, and where she lived and went to school. She understood the difference between the truth and a lie and that she had to tell the truth in court. K.O. did not know when her birthday was or when Santa Claus brought presents. During the court's questioning, the following took place:

"THE COURT: *** But you will tell us what's true today? You will tell us the truth?

THE WITNESS: I don't know.

THE COURT: Okay. If I ask you to tell me what's true, will you tell the truth and not a lie?

THE WITNESS: I don't know.

THE COURT: Okay. Tell me if you don't understand me.

THE INTERPRETER: Okay.

THE COURT: Have you had a problem with any words I have said to you?

THE WITNESS: No.

* * *

THE COURT: Would you do this for me: Would you raise your hand for me [?]

THE WITNESS: (Raising left hand.)

THE COURT: The other hand. And would you repeat this, would you say, I promise I will tell the truth.

THE INTERPRETER: I promise to tell the truth."

The court then found K.O. to be competent to testify, and the trial began.

K.O. testified through a Spanish/English interpreter. K.O. said that she went to her grandmother's house after school, but she did not go there anymore. Her grandmother and Aunt Minnie lived there. When asked if she knew if Minnie was married, she answered "No." She also answered "No" when asked if anyone else lived in the house and if she had any uncles. She did not remember the incident when she helped her father change her brother's diaper. She was feeling "[a] little embarrassed" about testifying. At the State's request, the court then took a short break. After resuming, K.O. testified that, in her grandmother's house, her grandmother slept upstairs, the kitchen was downstairs, and there was a basement. She did not know who slept in the basement. The State tried to calm K.O. and reminded her that she made a promise to the judge. K.O. then testified that she had seen her Aunt Alberteeta in the basement and that Alberteeta was married to Jimmy, whom she then pointed out as defendant. She stated that Jimmy was not her uncle but that he was married to Aunt Alberteeta. She liked Alberteeta but did not like Jimmy, although she could not say why she did not like him. She went to the police station but did not answer any questions. K.O. said that she had talked to the assistant State's Attorney the day before. She stated that she was nervous and that she wanted her mother near her. The court took another recess when K.O. put her head down and began to cry. When the trial resumed, the State asked K.O. if she was feeling better, then stated that it had no more questions.

The court then ruled that the State had produced K.O. to testify, although it noted:

> "[W]hen the young lady just took the stand again[,] she was still--I wouldn't say that it was sobbing, but she was--every time somebody asked her a limited question, she began to cry again and it was not a light crying by a child."

The court stated that it was aware of no law that required the State to "go through the event" with the witness and ruled as follows:

"THE COURT: Well, she is not unavailable because she is here. So the key is did she testify at the proceedings. She did testify at the proceedings. I found her to be competent. And if you wish to cross examine, then you can certainly cross examine and I'm not going to sustain any objections with respect to scope concerning the event because [the State] did in fact talk about places and people in this case, so [it] has opened the door to any of that anyway. So I am not going to overrule Judge Starck with respect to his findings because I didn't hear those particular statements. But I would find that the prong of having the child testify at the proceedings has been fulfilled. So if you wish to cross examine, you certainly can do that. So bring the child in here."

Other than establishing the fact that K.O. had a "Tio Jimmy," defense counsel asked a total of five questions about defendant. K.O. responded "I don't know" when asked if Jimmy was mean to her, if she thought that Jimmy did not like her, and if Jimmy told her to go upstairs when she went into the basement of her grandmother's house, where Jimmy lived. K.O. answered "No" when asked if she had ever told her parents a lie about Jimmy or if she had ever told her dad anything about him.

The State then presented the testimony of C.O., Stokes, and Montemayor, who all testified similarly to the statements they had previously made to the court.

Defendant first contends that the trial court erred in admitting K.O.'s out-of-court statements as substantive evidence at trial. We agree.

Section 115--10 of the Code, which allows for certain hearsay exceptions, provides in part:

"(a) In a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13, *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by the victim of an out of court statement made by the victim that he or she complained of such an act to another; and

(2) testimony of an out of court statement made by the victim describing any complaint of such an act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against the victim.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement ***." 725 ILCS 5/115--10 (West 2002).

Defendant argues that his right to confront witnesses against him, guaranteed by both the United States and the Illinois Constitutions, was violated by the trial court's admission pursuant to section 115--10 of K.O.'s out-of-court statements. See U.S. Const., amend. VI; Ill. Const. 1970, art.

I, §8. According to defendant, the court admitted testimonial hearsay without either: (1) the declarant testifying at trial and being subject to cross-examination; or (2) the declarant being unavailable to testify and defendant having a prior opportunity to cross-examine. However, cases should be decided on nonconstitutional grounds whenever possible, and constitutional issues should be decided only as a last resort. In re E.H., No. 100202, slip op. at 4 (December 21, 2006). Therefore, we will first consider whether the trial court's admission of K.O.'s out-of-court statements was proper under section 115--10. A trial court's rulings on evidentiary matters will not be reversed absent a clear abuse of discretion; however, evidentiary rulings involving questions of statutory interpretation or other questions of law are reviewed de novo. In re T.T., 351 Ill. App. 3d 976, 984 (2004).

Defendant first argues that K.O. did not testify at trial as required by section 115--10(b)(2)(A). The State did call K.O. as a witness. However, our review of K.O.'s "testimony" leads us to conclude that she did not testify pursuant to section 115--10. It took 10 pages of testimony before K.O. even admitted that a person named Jimmy existed; the only information about him given during the testimony was that Jimmy was the husband of K.O.'s Aunt Alberteeta and that K.O. did not like Jimmy, although she did not know why. After a few more pages of testimony, during which K.O. was asked about going to the police station and whether she had been asked some questions, K.O. put down her head and began to cry. After a short recess, the State asked whether K.O. felt better. After K.O. responded that she did not know, the State informed the court that it had no more questions.

We conclude that the trial court erred in ruling that K.O. was available and did testify, for purposes of section 115--10. A child witness is considered unavailable if the child is unwilling or

unable to testify because of fear, unable to communicate in the courtroom setting, or declared incompetent because she is incapable of expressing herself so as to be understood concerning the matter. In re T.T., 351 Ill. App. 3d 976, 984 (2004). With an available witness, the defendant is able to cross-examine the witness and test the reliability of her statements. In re Rolandis G., 352 Ill. App. 3d 776, 783 (2004). Regarding the defendant's ability to cross-examine a witness, it makes no difference whether the witness becomes "unavailable" before or after she takes the witness stand. Rolandis G., 352 Ill. App. 3d at 783-84.

In Rolandis G., the seven-year-old alleged victim of a sexual assault, V.J., was called to testify at trial. After he answered general questions about his living arrangements, school, and friends, he answered that he knew the respondent. However, he did not respond when asked how he knew him or whether he had played with the respondent that summer, and he refused to answer any more questions. The State presented the testimony of V.J.'s mother, a police officer, and a detective regarding out-of-court statements that V.J. had made, then called V.J. back to the stand. V.J. again refused to testify, and the State rested. Rolandis G., 352 Ill. App. 3d at 778-79. This court concluded that V.J. was an unavailable witness, even though he had been sworn in as a witness and had given some background testimony. Rolandis G., 352 Ill. App. 3d at 783-84.

The State, citing to the Fourth District Appellate Court decision in People v. Sharp, 355 Ill. App. 3d 786 (2005), argues "that the key question is whether the declarant was present for cross-examination and answered defense counsel's questions." In Sharp, the victim testified "at some length" about "what she did and with whom she did it" on the day that she was sexually assaulted. Sharp, 355 Ill. App. 3d at 795. However, she stopped her narrative after describing how the defendant pulled her into a room and pushed her to the floor; multiple attempts to get the victim to

describe what happened next were met with " 'No response by witness.' " Sharp, 355 Ill. App. 3d at 795. The victim later testified, still on direct examination, about what happened after the defendant released her from the room. The victim then answered all questions put to her on cross-examination, but defense counsel did not ask any questions about what the defendant did with her in the room. Sharp, 355 Ill. App. 3d at 795. The court concluded that, even in light of the victim's "apparent unwillingness or inability to testify on direct examination about what defendant did to her in the room," the victim " 'appeared' for cross-examination at trial." Sharp, 355 Ill. App. 3d at 795.

We cannot conclude that a witness's mere presence in court to answer general questions without testifying about the alleged offense is sufficient to qualify as an appearance pursuant to section 115--10. In Crawford v. Washington, the United States Supreme Court describes a declarant's appearance, for purposes of a confrontation clause analysis, as a situation where "the declarant is present in court to defend or explain" his out-of-court statement. (Emphasis added.) Crawford, 541 U.S. 36, 60 n.9, 158 L. Ed. 2d 177, 198 n.9, 124 S. Ct. 1354, 1369 n.9 (2004). In the case before us, the court told defense counsel that it would not "sustain any objections with respect to scope concerning the event because [the State] did in fact talk about places and people in this case." However, K.O. did not testify at all about the charge in this case. In order to get a declarant to "defend or explain" testimony not given on direct examination, a defendant is placed in the untenable position of both trying to elicit testimony about the alleged event and attempting to challenge and refute the very testimony he was forced to elicit. Mere presence and general testimony are insufficient for the appearance of a witness pursuant to section 115--10(b)(2)(A). We, therefore, conclude that K.O. did not testify.

If a child does not testify at trial, section 115--10(b)(2)(B) still allows the introduction of the child's out-of-court statement if "there is corroborative evidence of the act which is the subject of the statement." 725 ILCS 5/115--10(b)(2)(B) (West 2002). However, it is clear that there was no corroborative evidence of any act alleged in K.O.'s statements, as the only evidence presented in this case was the various recitations of K.O.'s out-of-court statements. The special concurrence finds corroboration of K.O.'s statements in her act of touching her infant brother's penis. The fact that K.O. reached out on her own and touched her brother's penis adds little if any weight or credibility to her statement that defendant "would touch her hand *** and put it on his parts." See slip op. at 15. The special concurrence's finding of additional corroboration in K.O.'s testimony that she did not like her uncle is unsupported by any authority or by common sense. There is no correlation between a witness disliking a defendant and the defendant's commission of the crime; the fact that a witness has a bias or prejudice against a defendant is usually seen as a reason to question the witness's credibility, not to enhance it.

> "A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, Evidence, §940, p. 775 (Chadbourn rev. 1970)." Davis v. Alaska, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 354, 94 S. Ct. 1105, 1110 (1974).

Because K.O. did not testify and there was no corroborative evidence presented, the trial court erred in admitting testimony regarding K.O.'s out-of-court statements, and defendant must be given a new

trial.  As we have decided this issue on statutory grounds, we need not address defendant's constitutional arguments.  We also need not address the special concurrence's lengthy analysis of the admissibility of K.O.'s statements pursuant to Crawford, as that issue is not presently justiciable.

Defendant next contends that the trial court erred in allowing Stokes to testify regarding K.O.'s statements made at the second interview, because Stokes' testimony was actually double hearsay.  According to defendant, Stokes did not speak Spanish, the language in which the second interview with K.O. was conducted.  As a result, Stokes did not testify as to what K.O. said; she testified as to what the translator, Montemayor, told her K.O. said.  The State argues that this issue is waived because defendant did not raise it in his motion for a new trial.  See People v. Enoch, 122 Ill. 2d 176, 186 (1988).  However, in the interests of judicial economy, we will address this issue, as it will probably arise during a retrial.

"Section 115--10(a)(2) 'clearly mandates that the testifying witness hear the child's remark personally.' [Citation]."  People v. Petitt, 245 Ill. App. 3d 132, 142 (1993).  Stokes no more heard K.O.'s remarks personally than K.O. heard Stokes' questions personally. Only Montemayor could testify as to what K.O. said.  Contrary to the State's assertion, this conclusion does not "preclude the application of section 115--10 when the victim cannot speak English."  The State must merely present the testimony of the person who actually heard the child's remarks--the translator.  If, on remand, the State again seeks to introduce K.O.'s out-of-court statements, it would be "plain error" for the trial court to allow Stokes to testify as to the "hearsay on hearsay" of what K.O. said in the December 30 interview.  See Petitt, 245 Ill. App. 3d at 142.

Defendant next contends that the trial court erred in finding that K.O. was a competent witness and that the time, content, and circumstances of K.O.'s statements provided sufficient safeguards of reliability (see 725 ILCS 5/115--10(b)(1) (West 2002)). Because of our disposition of defendant's other contentions, and the fact that new pretrial hearings would need to be held before trial on remand, we need not address these issues at this time.

Defendant next contends that the evidence was insufficient to support his conviction. A conviction will not be overturned on appeal unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. Petitt, 245 Ill. App. 3d at 135-36. Further, a conviction will not be overturned if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Petitt, 245 Ill. App. 3d at 136. We will consider all the evidence admitted at the trial, even evidence that was erroneously admitted. T.T., 351 Ill. App. 3d at 995.

Reviewing all the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to prove defendant's guilt. While the evidence was not overwhelming, especially regarding exactly when the offense allegedly occurred, the testimony of C.O. and Stokes was consistent as to the identification of defendant as the perpetrator and also as to at least two details, that defendant allegedly placed K.O.'s hand on his penis through the hole in his pants and that he placed her on his bed in the basement and put a cover over her. We cannot say that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Therefore, while we reverse the trial court's judgment in this case, we also remand the cause for a new trial.

For these reasons, the judgment of the circuit court of Lake County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

HUTCHINSON, J., concurs.

PRESIDING JUSTICE GROMETER, specially concurring:

Though I agree with the majority insofar as it reverses the judgment of the trial court and remands for a new trial, I disagree with much of its reasoning regarding the admissibility of K.O.'s out-of-court statements. K.O.'s statements were admissible under section 115--10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115--10 (West 2002)). However, the admission of K.O.'s statements to law enforcement personnel was improper under Crawford v. Washington, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203, 124 S. Ct. 1354, 1374 (2004). Her statements to her father, on the other hand, were not testimonial and therefore were admissible under Crawford. Accordingly, I write separately, though I concur in the ultimate result to which the majority comes.

As the supreme court made clear in In re E.H., No. 100202, slip op. at 4 (December 21, 2006), in analyzing a case like this, a court must first address any nonconstitutional issues (section 115--10) before turning to a constitutional issue (Crawford). Thus, whether K.O.'s statements were admissible under section 115--10 is the proper place to begin. Section 115--10 operates as an exception to the hearsay rule if either the child testifies or "there is corroborative evidence of the act which is the subject of the statement." 725 ILCS 5/115--10(b)(2)(B) (West 2002). I agree with the majority that K.O. did not testify as contemplated by section 115--10. However, her statements were sufficiently corroborated so as to allow their admission.

This court recently addressed corroboration under section 115--10 in In re Rolandis G., 352 Ill. App. 3d 776, 784 (2004). We first noted that "to corroborate means only ' "to add weight or credibility to a thing by additional or confirming facts or evidence." ' " Rolandis G., 352 Ill. App. 3d at 784, quoting People v. Alba, 185 Ill. App. 3d 286, 290 (1989), quoting In re Custody of Brunken, 139 Ill. App. 3d 232, 239 (1985). For the purpose of section 115--10, "corroborating evidence need not prove the commission of the crime beyond a reasonable doubt or make it overwhelmingly probable; it need only 'add weight or credibility' to the out-of court statements." Rolandis G., 352 Ill. App. 3d at 784. In Rolandis G., 352 Ill. App. 3d at 784, we found the following to sufficiently corroborate the victim's out-of-court statements so as to allow their admission: (1) that the victim was with the defendant on the day at issue, and (2) that the victim behaved strangely in that he did not want to go outside on a summer day, that he rinsed his mouth repeatedly, and that he was evasive when asked about his behavior.

In this case, K.O.'s statements were also corroborated by strange behavior. Specifically, K.O. touched her younger sibling's penis as C.O. changed his diaper. At issue is K.O.'s statement that "[Jimmy] would touch her hand *** and put it on his parts." Thus, K.O.'s behavior mimicked the act of which she was speaking. Additional, albeit minimal, corroboration can be found in the testimony K.O. gave on the stand prior to being unable to answer further questions. K.O. testified that, though she liked her aunt, she did not like defendant, her uncle. This evidence, particularly K.O.'s conduct, adds weight to her statements. Given that corroborating evidence need only add weight or credibility to a child's statement for it to be admissible (Rolandis G., 352 Ill. App. 3d at 784), K.O.'s statements were admissible under section 115--10.

Having resolved the nonconstitutional issue, I will now address whether K.O.'s statements were admissible under Crawford. Here, I conclude that her statements to her father were admissible and that her statements to law enforcement personnel were not. Under Crawford, as defendant had no opportunity to cross-examine K.O., the admissibility of her statements turns on whether they were testimonial. Crawford, 541 U.S. at 59, 158 L. Ed. 2d at 197, 124 S. Ct. at 1368-69.

Admittedly, sound guidance on what constitutes a testimonial statement is a bit lacking. In Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " Nevertheless, Crawford does provide some clues as to the characteristics of a testimonial statement, as does the Supreme Court's only opinion interpreting Crawford, Davis v. Washington, 547 U.S. ___, 165 L. Ed. 2d 224, 126 S. Ct. 2266 (2006). Case law from across the nation reveals additional considerations that courts consider relevant to this inquiry. The way, then, to start, is to review these decisions and ascertain what these factors are.

Crawford did establish a few bright-line rules as to testimonial statements, holding that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. K.O.'s statements do not fit within any of these categories; therefore, they require further analysis.

The Crawford Court also offered what it termed "various formulations" of the "core class" of testimonial statements, which include:

" 'ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements...contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[]' [citation]."

Crawford, 541 U.S. at 51-52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364.

The references to "ex parte in-court testimony" and "affidavits, depositions, prior testimony, or confessions" provide no additional significant guidance in that the per se categories articulated above are, in essence, these types of statements. However, two of the three formulations do set forth an additional consideration: what a reasonable person in the declarant's position would expect regarding the future use of a statement. Thus, the state of mind, assessed objectively, of a reasonable person in the declarant's position is relevant.

Additionally, Crawford provides the following definition of "testimony": " '[A] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.]" (Emphasis added.) Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364. This definition, which incorporates the reason that the statement was made, suggests that the subjective intent of the declarant is relevant. Cf. Downey Venture v. LMI Insurance Co., 66 Cal. App. 4th 478, 494, 78 Cal. Rptr. 2d 142, 150-51 (1998) ("The 'malice' element [of malicious prosecution] *** relates to the subjective intent or purpose with which the defendant acted in initiating the prior action"). In Rolandis G., 352 Ill. App. 3d at 782 n.1, this court, while noting that a "definition of 'testimonial' that turned solely on the subjective knowledge or intent of the declarant would be both unfair and unworkable," recognized that "a declarant's subjective understanding might be relevant

in some cases, such as where the circumstances surrounding the statement are ambiguous." Thus, in some cases, the actual state of mind of the declarant might illuminate the inquiry.

An additional consideration can be gleaned from <u>Davis v. Washington</u>, 547 U.S. ___, 165 L. Ed. 2d 224, 126 S. Ct. 2266, namely, the state of mind of a person questioning the declarant. There, the Supreme Court held:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." <u>Davis</u>, 547 U.S. at ___, 165 L. Ed. 2d at 237, 126 S. Ct. at 2273-74.

The Supreme Court articulated this factor as the "purpose <u>of the interrogation</u>." (Emphasis added.) <u>Davis</u>, 547 U.S. at ___, 165 L. Ed. 2d at 237, 126 S. Ct. at 2274. Thus, in <u>Davis</u>, the state of mind of the interrogator, measured objectively, rather than that of the declarant, was at issue. It is also worth noting that the Supreme Court spoke of the "primary purpose," indicating that when mixed motives are involved, a court should give weight to the main one.

The <u>Davis</u> Court also identified four additional factors. The Supreme Court found relevant whether a declarant's statement was a description of events as they were happening or a recounting of past events. <u>Davis</u>, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. It further noted that the intent of the declarant, which, in <u>Davis</u>, was to seek police assistance during an ongoing emergency, aided its inquiry. <u>Davis</u>, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. The

nature of the questions and the statement was also deemed a consideration. Davis, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. Finally, the Court relied upon the "level of formality" of the questioning. Davis, 547 U.S. at ___, 165 L. Ed. 2d at 240, 126 S. Ct. at 2276. Regarding this last point, Crawford expressed a related consideration--whether the statement was given in response to structured police questioning. Crawford, 541 U.S. at 53 n.4, 158 L. Ed. 2d at 194 n.4, 124 S. Ct. at 1365 n.4. This court articulated a similar point when we relied on the "formal and systematic" nature of questioning in finding a statement testimonial. Rolandis G., 352 Ill. App. 3d at 781.

A factor that the Supreme Court has expressly declined to address is whether a statement may be deemed testimonial when it is made to someone other than a law enforcement officer or other representative of the government. Davis, 547 U.S. at ___ n.2, 165 L. Ed. 2d at 238 n.2, 126 S. Ct. at 2274 n.2. Some courts that have addressed the question have held that the involvement of a governmental actor is an important factor. See People v. Compan, 100 P.3d 533, 537 (Colo. App. 2004) ("Thus, it appears that testimonial statements under Crawford will generally be (1) solemn or formal statements (not casual or off-hand remarks), (2) made for the purpose of proving or establishing facts in judicial proceedings (not for business or personal purposes), (3) to a government actor or agent (not to someone unassociated with government activity)" (emphasis added)). In this State, the First District of the Appellate Court has observed that "Crawford indicates that governmental involvement in some fashion in the creation of a formal statement is necessary to render the statement testimonial in nature." In re T.T., 351 Ill. App. 3d 976, 988 (2004). While I am not prepared to go so far as to say that the involvement of a governmental actor is a necessary condition, I do believe that it is a consideration entitled to some weight. See State v. Wilkinson, 178 Vt. 174, 178, 879 A.2d 445, 448 (2005) (considering, inter alia, the absence of police and

prosecutorial involvement at the time a statement was made); cf. Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not").

Thus, as the preceding discussion makes clear, numerous factors have been held relevant in determining whether a statement is testimonial. These include the following: (1) the state of mind of the declarant; (2) how a reasonable person in the declarant's position would regard the statement; (3) the primary purpose, as revealed objectively by the circumstances, of a person posing questions; (4) the nature of the questions and the statement; (5) the level of formality of the questioning and the statement; (6) whether the statement was a description of presently occurring events or a recollection of past events; and (7) the involvement of a governmental actor. One factor identified in Davis, 547 U.S. at ___, 165 L. Ed. 2d at 240-41, 126 S. Ct. at 2276-77, that the declarant was seeking police assistance while facing an ongoing emergency, is really just another way of addressing the state of mind of the declarant. Therefore, I do not list it as a separate factor. While this list surely will not represent the last word as to what is relevant to the determination of whether a statement is testimonial, it does represent factors that courts are currently using to guide their analyses of the issue.

Because different factors are at issue, I will first address K.O.'s statement to her father and then separately address her statements to law enforcement personnel. The first thing to consider is K.O.'s subjective state of mind. Though, as we recognized in Rolandis G., 352 Ill. App. 3d at 782, evidence of a declarant's actual mind state will often be difficult to find, in this case, such evidence exists in the record. C.O. testified that, as he was changing his son's diaper, K.O. touched his son's penis. C.O. told K.O., "That's not correct. You shouldn't touch his parts. *** Nobody should touch

anybody else." K.O. replied, "Why not? Jimmy does it." From K.O.'s statement, it is clear that, not only was she not accusing defendant of any wrongdoing, but she did not perceive her own behavior to be unacceptable and she was referring to defendant's actions in an attempt to justify her behavior. That K.O. did not perceive defendant's behavior as wrongful at the time she made the statement to C.O. is confirmed by C.O.'s later testimony that "[s]he didn't know it was bad." In fact, as C.O. also testified, not until K.O.'s grandmother became involved in the conversation did K.O. "realize \*\*\* something was wrong." Since K.O. did not realize that defendant's actions were wrong, her subjective state of mind was obviously inconsistent with bearing witness against defendant. This first factor, then, weighs strongly against a finding that K.O.'s statement to C.O. was testimonial.

The second factor considered in cases applying Crawford is the state of mind of the declarant, measured from an objective perspective. The argument has been advanced that children of tender years lack the capacity to form a state of mind consistent with the various formulations of testimonial statements set forth in Crawford. For example, in Rolandis G., 352 Ill. App. 3d at 782, the State posited that no child would typically contemplate that anything he or she would say would later be available for trial. There is certainly some logic to this observation; however, a more realistic standard can be used for evaluating statements made by young children. In such situations, one commentator observes that "there is something a little odd about asking, with respect to a statement by a young child, what the anticipation of a reasonable adult would be." R. Friedman, Grappling with the Meaning of Testimonial, 71 Brook. L. Rev. 241, 273 (2005). The same commentator, while discussing the assessment of the subjective state of mind of a child, asserts that "[i]t should be enough if the child understood that she was reporting wrongdoing and that some adverse consequences--including that Mommy would get mad--would be visited on the wrongdoer." R.

Friedman, Grappling with the Meaning of Testimonial, 71 Brook. L. Rev. 241, 273 (2005). This suggestion is sensible, and I see no reason why it would be inappropriate to utilize it objectively. Thus, the question here is whether a reasonable child would typically understand that he or she was reporting wrongdoing and that adverse consequences would likely befall the wrongdoer. It seems to me that most children in this day and age would understand that he or she was reporting wrongdoing if placed in K.O.'s position. Hence, this factor favors finding K.O.'s statement testimonial. However, given that we have good evidence of K.O.'s actual state of mind, that factor should control. After all, what is being assessed is whether the declarant was acting as a witness. Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192, 124 S. Ct. at 1364. The declarant's actual state of mind is a better indicator as to what the declarant's purpose was in making a statement.

Third, from Davis, 547 U.S. at ___, 165 L. Ed. 2d at 236-37, 126 S. Ct. at 2273-74, we must assess the primary purpose of C.O. in questioning K.O. That C.O. was seeking to learn what happened to his daughter and to ascertain who did it is undoubtedly true; however, that observation should not end the inquiry. In Davis, 547 U.S. at ___, 165 L. Ed. 2d at 236-37, 126 S. Ct. at 2273-74, the Supreme Court observed that where the primary purpose of questioning is to react to an ongoing emergency, as opposed to establishing and proving past events, statements elicited are not testimonial. Here, it must be remembered that C.O. is a parent rather than a law enforcement officer. Thus, it is reasonable to suppose that his questions were designed to allow him to tend to his daughter's well-being. A reasonable parent would want information to assess the need for medical treatment or counseling. Additionally, a reasonable parent would want to know who perpetrated the abuse so that that person would not be allowed access to the child. In other words, a parent confronted with a revelation of abuse is reacting to an ongoing emergency in the sense that there may

be a real and present need for certain actions to be taken to insure the child's well-being. Indeed, C.O. testified that he tried not to scare his daughter as he was speaking with her, indicating that his daughter's psychological well-being was on his mind.

The fourth factor requires analysis of the nature of the questions and the statement. This factor weighs in favor of finding the statement testimonial. The content of the conversation between K.O. and C.O. concerned defendant's identity and his crimes.

The fifth consideration is the level of formality of the questioning and the statement. C.O. did pose a series of questions in an attempt to learn more about defendant's actions; however, the questioning flowed naturally and spontaneously from the earlier conversation between C.O. and K.O. Moreover, the setting was quite informal. The statement was not made in a police interview room or the like; it was made in K.O.'s home while the family was engaged in otherwise normal activity. Given that structured questioning was involved, this factor slightly favors K.O.'s statement being deemed testimonial. I do not, however, believe that the factor is entitled to great weight due to the setting in which the statement was made.

The sixth factor identified above is whether the statement was a description of presently occurring events or a recounting of past events. K.O.'s statement clearly concerned past events. This factor, therefore, supports finding her statement testimonial.

Finally, the seventh factor requires a court to consider whether a governmental actor was involved in the production of the statement. C.O. was not acting on behalf of the government. Hence, this factor indicates that K.O.'s statement was not testimonial.

Thus, I conclude that K.O.'s actual state of mind, C.O.'s state of mind, measured objectively, and the lack of involvement of the government in the production of the statement all indicate that

K.O.'s statement was not testimonial. The nature of the questioning and the statement as well as the fact that the statement was a description of past events militate for a contrary conclusion. The level of formality of the questioning and the expectations of a reasonable child in K.O.'s position provide some weak support to conclude that the statement was testimonial. In this case, I believe that the first three factors listed in this paragraph should control.

After all, what we are analyzing here is a conversation between a parent and a child taking place in the family home. Numerous courts interpreting Crawford have found statements made in conversations between family members and friends nontestimonial. See State v. Aaron L., 272 Conn. 798, 813 n.21, 865 A.2d 1135, 1145 n.21 (2005); Purvis v. State, 829 N.E.2d 572, 579 (Ind. App. 2005) ("Parents of young children constantly question them about their activities, often to ensure that the children are behaving safely. When parents find illegal activity or victimization, they naturally contact appropriate authorities. The fact that parents turn over information about crimes to law enforcement authorities does not transform their interactions with their children into police investigations. When they questioned M.B., Gray and Shawn were motivated primarily to find out what happened so that they could protect M.B.'s safety. This activity is sufficiently attenuated from law enforcement conduct to be non-testimonial under Crawford"); Commonwealth v. Gonsalves, 445 Mass. 1, 17-18, 833 N.E.2d 549, 561-62 (2005); State v. Brigman, 171 N.C. App. 305, 311-12, 615 S.E.2d 21, 24-25 (2005) (statement made to foster mother held nontestimonial); State v. Wilkinson, 178 Vt. 174, 879 A.2d 445 (2005); State v. Walker, 129 Wash. App. 258, 273, 118 P.3d 935, 942 (2005) ("The record indicates that the exchange between Bobbi and C.M. was that of a conversation between a concerned parent and an upset child, nothing more"); Herrera-Vega v. State, 888 So. 2d 66, 69 (Fla. Dist. App. 2004) ("Whatever the United States Supreme Court eventually decides

'testimonial' evidence consists of, it does not appear to include the spontaneous statements made by D.H. to her mother while being dressed, nor does it include D.H.'s statements to her father"); State v. Bobadilla, 690 N.W.2d 345, 350 (Minn. App. 2004) ("T.B.'s statement to his mother was not testimonial. T.B.'s mother questioned T.B. about the redness around his anus out of concern for his health, not because she expected to develop a case against Bobadilla"), rev'd on other grounds, 709 N.W.2d 243 (Minn. 2006); State v. Blackstock, 165 N.C. App. 50, 62-63, 598 S.E.2d 412, 420 (2004) ("Moreover, the fact that Weeks made the statements to his wife and daughter mitigates against the possibility that he understood he was 'bearing witness' against Defendant"). I find these cases persuasive. Conversations between family members, even when they pertain to criminal acts, are not the sorts of statements that the confrontation clause is concerned with. The extensive discussion in Crawford of the history of the right of confrontation confirms that it was primarily directed at governmental abuses. See, e.g., Crawford, 541 U.S. at 50, 158 L. Ed. 2d at 192, 124 S. Ct. at 1363 ("[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused").

I will now briefly turn to the statements to which Stokes and Montemayor testified. There is little evidence in the record that would illuminate K.O.'s subjective state of mind at the time these statements were made. However, a reasonable person, even of K.O.'s age, would likely understand that some adverse consequences would be visited upon the wrongdoer, so the objective state of mind of the declarant favors a finding that the statements were testimonial. The primary purpose of the interviews appears to have been to gather evidence for use against defendant. The nature of the statements and the questioning concerned potential crimes. Further, the questioning took place not

in the family home but in the Children's Advocacy Center, indicating a greater degree of formality. As with her statement to her father, K.O.'s statements to Stokes and Montemayor concerned past events. Finally, these statements were made to governmental agents. Considering the totality of these factors, these statements were testimonial in nature.

Undoubtedly, this area of the law is in flux. It would not be surprising if the test that courts ultimately settle on looks much different from that articulated in this special concurrence. Nevertheless, I believe that the considerations set forth here provide a realistic and complete analysis based upon what courts are doing right now. I do agree with the majority that we must reverse and remand; however, I believe that on remand, K.O.'s statements to C.O. should be admissible. I therefore respectfully specially concur.